UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

————————————————————X
                                          :
GLOBAL CROSSING ESTATE                    :
REPRESENTATIVE, FOR ITSELF AND AS         :
THE LIQUIDATING TRUSTEE OF THE            :
GLOBAL CROSSING LIQUIDATING TRUST,        :        06 Civ. 6452 (GEL)
                                          :
            Plaintiff,                     :
                                          :
      v.                                  :
                                          :
CIBC CAPITAL PARTNERS (CAYMAN) NO. 3,     :
*et al.,*                                 :
                                          :
            Defendants.                    :
————————————————————X

**DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR MOTION
TO DISMISS THE COMPLAINT**

MAYER, BROWN, ROWE & MAW LLP
1675 Broadway
New York, New York 10019
(212) 506-2500

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ....................................................................................................... ii

INTRODUCTION ..................................................................................................................... 1

BACKGROUND ....................................................................................................................... 4

ARGUMENT ............................................................................................................................ 9

I.     The Court Should Not Extend *Diamond v. Oreamuno* To
       Recognize A Cause Of Action By The Corporation For
       "Tippee" Liability .......................................................................................................... 9

II.    The Estate Representative Has Failed To Properly
       Plead A Claim For Tippee Liability ............................................................................. 14

CONCLUSION ......................................................................................................................... 21

i

## TABLE OF AUTHORITIES

*Cases*

*Assoc. for Retarded Citizens of Connecticut, Inc. v. Thorne,*
  30 F.3d 367 (2d Cir. 1994) ...................................................................................... 12

*Diamond v. Oreamuno,* 24 N.Y.2d 494 (N.Y. 1969) ............................................... *passim*

*Dura Pharms., Inc. v. Broudo,* 544 U.S. 336 (2005) ................................................ 20

*In re Elevator Antitrust Litig.,* 2006 WL 1470994 (S.D.N.Y.
  May 30, 2006) ......................................................................................................... 20

*Endovasc Ltd., Inc. v. J. P. Turner & Co.,* 2004 WL 634171
  (S.D.N.Y. Mar. 30, 2004) ...................................................................................... 16

*Ganino v. Citizens Utilities Co.,* 228 F.3d 154 (2d Cir. 2000) ................................... 3

*Gildenhorn v. Lum's Inc.,* 335 F.Supp. 329 (S.D.N.Y. 1971) ................................ 9, 10

*Global Crossing Estate Representative v. Winnick,*
  2006 U.S. Dist. LEXIS 53785 (S.D.N.Y. Aug. 3, 2006) ...................................... 2, 13

*In re Global Crossing, Ltd. Sec. Litig.,* 2005 U.S. Dist. LEXIS 26492
  (S.D.N.Y. Nov. 7, 2005) ........................................................................................ 12

*Goldman v. Isaacs,* 2001 WL 1671439 (Del. Ch. Dec. 17, 2001) ............................. 13

*Lehman Bros. v. Schein,* 416 U.S. 386 (1974) .......................................................... 11

*In re Oracle Corp. Derivative Litig.,* 808 A.2d 1206 (Del. Ch. 2002) ...................... 13

*In re Oxford Health Plans, Inc.,* 187 F.R.D. 133 (S.D.N.Y. 1999) ........................... 18

*Rattner v. Bidzos,* 2003 WL 22284323 (Del. Ch. Oct. 7, 2003) ................................ 19

*Rombach v. Chang,* 355 F.3d 164 (2d Cir. 2004) ................................................. 14, 15

*Schein v. Chasen,* 478 F.2d 817 (2d Cir. 1973),
  *vacated sub. nom. Lehman Bros. v. Schein,* 416 U.S. 386 (1974) ........... 10, 11, 12, 13, 14

Statutes

Section 10(b) of the Securities Exchange Act of 1934 ................................................................12

Section 16(b) of the Securities Exchange Act of 1934 ................................................................12

Section 20A of the Securities Exchange Act of 1934,
    15 U.S.C. § 78t-1(a)-(b), ......................................................................................................12

This memorandum is submitted on behalf of all of the defendants named in the complaint, with the exception of CIBC Capital Partners (Cayman) No. 3. CIBC Capital Partners is a dissolved Cayman Islands corporation which has not yet been served and in fact cannot be served because, under the governing Cayman Islands law, it no longer has the capacity to sue or be sued.

## INTRODUCTION

This lawsuit is a sequel to the Estate Representative's claims against the Canadian Imperial Bank of Commerce ("CIBC") and certain of its affiliates. The Estate Representative sued CIBC two years after Global Crossing's bankruptcy, accusing it of insider trading (among other things) and seeking disgorgement of all of the profits CIBC had realized by selling Global Crossing stock. In subsequent versions of the complaint, the Estate Representative added a number of CIBC-related entities as defendants — although it did not add CIBC Capital Partners, which (according to the new complaint) was the actual seller of much of the stock the Estate Representative attributed to CIBC. Two and a half years after the Estate Representative first filed its complaint against CIBC (and four and a half years after Global Crossing filed for bankruptcy), the Estate Representative sought to remedy that defect by filing the new complaint at issue here.

But the new complaint also seeks to go far beyond CIBC and its affiliated companies, suing for the first time dozens of investment vehicles owned by employees of CIBC World Markets, including Subchapter S corporations owned by the five high-ranking CIBC World Markets executives who served on the Global Crossing Board (the "CIBC-Related Directors"). The Estate Representative alleges that the CIBC-Related Directors engaged in "a multiyear scheme" together with Global Crossing insiders to deceive the market about Global Crossing's

"true financial condition" so that the Directors, CIBC and the newly-added defendants could all profit by selling their Global Crossing stock based on inside information. Complt. ¶ 3.

The Subchapter S corporations owned by the five CIBC-Related Directors have filed a separate motion for summary judgment,

**REDACTED**

But the claims against those corporations and all of the other defendants that have been served should also be dismissed under Rule 12(b)(6) for two reasons.

First, the New York Court of Appeals has never extended the rationale of *Diamond v. Oreamuno*, 24 N.Y.2d 494, 496-97 (N.Y. 1969), to allow corporations to sue "tippees" for disgorgement of insider trading profits.[1] Nor would it be likely to do so today. As the CIBC defendants argued in *Global Crossing Estate Representative v. Winnick*, 2006 U.S. Dist. LEXIS 53785 (S.D.N.Y. Aug. 3, 2006), the creation of effective federal remedies for insider trading eliminates the perceived need for and indeed preempts a competing state law remedy. Although the Court concluded in its August 3, 2006 ruling that it was bound by *Diamond* unless and until it was reversed by the New York Court of Appeals, it should reject the Estate Representative's invitation to extend *Diamond* a step further to create a whole new state law cause of action for "tippee" liability.

Second, even if the cause of action exists, the Estate Representative has failed to properly plead it. The complaint does allege, in a conclusory fashion, that all of the defendants engaged in a "common enterprise" to pass material inside information to the defendants so they could sell

---

[1]     Defendants assume for purposes of argument that New York law applies, as the Estate Representative has always claimed. However, they reserve the right to contest the choice of law issue in the future.

their stock at inflated prices.  Complt. ¶ 251.  But there are no factual allegations to support that assertion.  Indeed, as to the vast majority of defendants, the Estate Representative does not even allege the most basic facts necessary to support an insider trading claim — *when* the defendants sold the stock and at what price.  Instead, the complaint simply alleges "on information and belief" that the stock was sold at some unidentified point in time after it was received.  *See* Complt. ¶¶ 199-222.

The Estate Representative's decision to include the M. Monello Corporation as a defendant illustrates the fundamental defect in its claim.  In ¶ 169 of the complaint, the Estate Representative hypothesizes that the last two CIBC-Related Directors resigned from the Global Crossing Board in June 2000 so that all of the defendants could quietly dump their stock before the "truth" about Global Crossing came out.  Yet the complaint alleges that Monello did not sell any of its 2 million plus shares of Global Crossing stock until November 14, 2001, seventeen months after the last CIBC-Related Directors left the Global Crossing Board and only a few months before Global Crossing declared bankruptcy.  Complt. ¶ 192.  By November 14, 2001, Global Crossing's stock had fallen to just $1.20 per share — making any claim that Monello engaged in insider trading absurd on its face. *See* Ex. 1 to the Declaration of Vincent P. Schmeltz III.[2]  Similarly, the lack of any alleged pattern of selling by the defendants shortly after June 2000 is enough, in and of itself, to require dismissal of the claim that they all conspired to engage in an insider trading scheme.

---

[2]      The Court can take judicial notice of Global Crossing's stock prices because those prices are a matter of public record and are not subject to reasonable dispute. See *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 166 n.8 (2d Cir. 2000).

BACKGROUND[3]

CIBC provided venture capital and financing to Global Crossing before its IPO in 1998. In return for its investment, CIBC received stock and the right to designate five Board members. Complt. ¶¶ 54, 138. Employees of CIBC World Markets had the opportunity to participate in CIBC's investment in Global Crossing through two investment funds.  Defendant CIBC WG Argosy Merchant Fund 3 LP ("CIBC Argosy") was a Bermuda partnership controlled by five managing directors of CIBC-related entities, including two of the CIBC-Related Directors (Jay Bloom and Dean Kehler).  Complt. ¶¶ 22, 183.  Defendant Co-Investment Merchant Fund LLC ("Co-Investment Fund") was a Delaware limited liability company that was formed for the purpose of allowing other employees of CIBC-related entities (including the other three CIBC-Related Directors) to invest in ventures undertaken by CIBC and its affiliates.  Complt. ¶ 23, 195.

The complaint alleges that both CIBC Argosy and the Co-Investment Fund owned Global Crossing stock, although it does not explain when or how the funds acquired that stock. CIBC Argosy originally owned 15.6 million shares of Global Crossing stock; it distributed 12.9 million of those shares to corporations formed by its limited partners for that purpose on February 15, 2000, "pursuant to a compensation plan." Complt. ¶¶ 184, 187.  The Co-Investment Fund owned a total of 8.7 million shares; it distributed 5.7 million shares on August 15, 2000 to corporations that were owned by twenty-four individual employees of CIBC-related entities.  Complt. ¶¶ 196, 221. The complaint names as defendants all of the employee corporations that received Global Crossing stock distributed by CIBC Argosy and the Co-Investment Fund. Five of those corporations (referred to herein as the "Director Corporations") were owned by the CIBC-

---

[3]     For purposes of this motion to dismiss, defendants are, of course, required to assume the truth of the well-pleaded allegations of the complaint.

Related Directors. The other 25 (referred to herein as "Non-Director Corporations") were owned by employees of CIBC-related entities who were not directors and who therefore owed no fiduciary duties whatsoever to Global Crossing. The complaint also names as a defendant Caravelle Investment Fund, LLC, which was a limited liability company owned by two of the CIBC-Related Directors (Bloom and Kehler) and Andrew Heyer, another managing director of a CIBC-related entity. Complt. ¶ 24. The complaint alleges that the Caravelle Fund owned 218,434 shares of Global Crossing stock "as of March 30, 2000," but once again does not explain how the Fund acquired that stock. Complt. ¶ 222.

The Estate Representative does not allege that any of the defendants on whose behalf this motion is filed sold any Global Crossing stock before June 20, 2000, when the last three CIBC-Related Directors resigned from the Global Crossing Board.[4]  That is true even though the price of Global Crossing stock fell from $61.00 per share in February 2000 to $23.62 by May 23, 2000. Complt. ¶ 233. The complaint alleges that all of the defendants sold their "remaining" Global Crossing stock after the CIBC-Related Directors resigned from the Global Crossing Board. That is, of course, hardly surprising: a large proportion of shareholders who held Global Crossing stock no doubt sold it at some point during the Company's descent into bankruptcy. As noted above, with respect to 22 of the 25 Non-Director Corporations, the Estate Representative

---

[4]     The complaint alleges that in May 1999 CIBC Argosy and the Co-Investment Fund received some unidentified share of the profits from CIBC's tender of Global Crossing shares in response to U.S. West's tender offer. Complt. ¶ 152. There is no allegation that the Funds themselves tendered any stock. Although it is not entirely clear, we assume that the Estate Representative is not seeking to recoup any of the profits realized in the U.S. West tender offer from any of the defendants named in this lawsuit, since the complaint appears to be limited to the defendants' own sales of Global Crossing stock. See Complt. ¶ 250. In any event, any claim based on conduct before the CIBC-Related Directors resigned from the Global Crossing Board on June 20, 2000 is clearly time-barred even if, as the Estate Representative argued in the Winnick litigation, a 6-year statute of limitations applies. The complaint in this case was not filed until June 20, 2006 — six years to the day after the last CIBC-Related Directors left the Global Crossing Board.

alleges only that the company received a certain number of shares of Global Crossing stock on a particular date and "on information and belief" "sold these shares in a Rule 144(k) sale" — without any indication of *when* the sale occurred or at what price.[5]

To the extent that the complaint does provide information about when some of the sales occurred, there is no discernible pattern of selling. Three of the Non-Director Corporations are alleged to have sold their stock on specific dates. The earliest sale was by L. Wagner Corporation, which had received stock from CIBC Argosy in February 2000 when it was trading at $61 per share. Complt. ¶ 184. On July 18, 2000, L. Wagner Corporation allegedly sold 250,000 shares in a private offering for $8.25 million or $33 per share. Complt. ¶ 193. But the company retained another 1.8 million shares and did not sell them until November 20, 2000, shortly after Global Crossing had announced a loss of $1.2 billion for the first nine months of 2000 and the market price of its stock had dropped to $15 per share. Complt. ¶ 194 and Schmeltz Decl. Exs. 1 and 2 (at 6).

After Wagner's July 2000 sale, the next alleged sale by a Non-Director Corporation was on September 19, 2000, when A. Heyer Corporation sold 250,000 shares; at that point, the stock was trading at $30 per share. Complt. ¶ 189.[6] But once again, Heyer retained the bulk of its shares, holding on to 2.6 million shares until January 8, 2001, nearly six months after the CIBC-

---

[5]    That is the allegation with respect to E. Levy Corporation, B. Spohler Corporation, W. McLallen Corporation, K. Read Corporation, B. Gerson Corporation, K. Magid Corporation, T. Murphy Corporation, M. Dalton Corporation, N. Wiesenberg Corporation, E.J. Pipkin Corporation, J. Budish Corporation, J. Ross Corporation, P. Daniels Corporation, E. Mally Corporation, H. Noeding Corporation, N. Thomas Corporation, L. DeBauge Corporation, A. Woolford Corporation, N. Wessan Corporation, S. Shapiro Corporation, and J. Moglia Corporation. Complt. ¶¶ 199-220.

[6]    The complaint also alleges that A. Heyer Corporation transferred 300,000 shares of Global stock to the Goldman Sachs 2000 Exchange Fund on July 21, 2000. Complt. ¶ 188. At that point, the stock was trading at $29.75 per share. *See* Schmeltz Decl. Ex. 1.

Related Directors had left the Board. Complt. ¶ 190. At that point, the stock had dropped to $19.50 per share. Schmeltz Decl. Ex. 1.

The third sale by a Non-Director Corporation was the sale by the M. Monello Corporation on November 14, 2001 of 2.18 million shares of Global Crossing stock. Complt. ¶ 191. As noted above, by that date Global Crossing stock had dropped to $1.20 per share. As a result, Monello's stock, which had been worth over $65 million in June 2000 when the CIBC-Related Directors resigned from the Board, was worth only $2.6 million.

The complaint provides more information about sales by the Director Corporations. It alleges that B. Raben Corporation sold its 1.1 million shares on October 16, 2000, when the stock was trading at $24.63. Complt. ¶ 197; Schmeltz Decl. Ex. 1. D. Kehler Corporation and J. Bloom Corporation sold their Global Crossing stock (3.1 and 1.98 million shares respectively) on January 8, 2001, when the stock was selling at $19.50 per share. Complt. ¶¶ 187, 191; Schmeltz Decl. Ex. 1.[7] J. Levine Corporation did not sell until much later, but hedged its risks, entering into two options to sell on September 29, 2000. One was an option to sell 19,000 Global Crossing shares within the next year at a floor price of $30.78 (which was the approximate market price on that date) and a cap of $40; the other was an option to sell 180,000 shares within the next year at a strike price of $20 per share. Complt. ¶ 198. By September 2001, the price of Global Crossing stock had dropped to about $2 per share, so the option transactions were closed at the floor prices. *Id.*; Schmeltz Decl. Ex. 1. No information is provided with respect to the fifth Director Corporation (W. Phoenix), which is alleged to have sold at an unidentified date. Complt. ¶ 199.

---

[7]     Like Heyer, J. Bloom Corporation had transferred 300,000 shares of Global Crossing stock to the Goldman Sachs 2000 Exchange Fund on July 21, 2000. Complt. ¶ 186.

As to the other defendants, there is an allegation that on January 22, 2001, CIBC Argosy sold its remaining 2.7 million shares; at that point, the stock was trading at $23.38. Complt. ¶ 185; Schmeltz Decl. Ex. 1. But there is no allegation as to when the Co-Investment Fund sold its remaining 3 million shares or when Caravelle Partners sold its shares. Complt. ¶¶ 221-22.

The Estate Representative alleges that all of these sales, including Monello's and the more than two dozen sales made at unidentified dates, were made based on undisclosed, material inside information. The complaint repeats the allegations made in both the *Winnick* action and the securities fraud action that the CIBC-Related Directors supposedly knew that Global Crossing was misstating its financial results by improperly accounting for the sale of IRUs. Complt. ¶¶ 101-136. It then goes even further, alleging that by June 2000 the CIBC-Related Directors and all of the defendants "knew that Global was insolvent" and "wanted to sell their artificially inflated stock before the reality of Global's financial condition became known to the public." Complt. ¶ 169. The Estate Representative alleges that the last three CIBC-Related Directors resigned from the Global Crossing Board so that those sales could be accomplished "anonymously." *Id.*

Based on these allegations, the Estate Representative asserts three claims for relief, which are all based on the same legal theory and all seek the same damages. The legal theory is that the defendants participated in claimed breaches of fiduciary duty by the CIBC-Related Directors and other insiders. Paragraph 247 alleges that "the CIBC Directors acted together with others to repeatedly violate their fiduciary duties of loyalty to Global and aid and abet similar violations by others — violations for which Defendants are responsible." Similarly, ¶ 251 alleges that the defendants were "engaged with the CIBC Directors and the CIBC Entities in a common enterprise" to pass on undisclosed material inside information to defendants to use in trading

Global Crossing stock and that the defendants knew the disclosure of that information to them was "in violation of the CIBC Directors and the CIBC Entities' fiduciary duty of loyalty owed to Global and its creditors." All three counts of the complaint seek damages equal to the profits the defendants realized from the alleged insider trading. Count I seeks disgorgement. Count II seeks to impose a constructive trust on the amounts by which the defendants were supposedly "unjustly enriched." And Count III seeks an accounting "for all profits made in connection with [defendants'] insider selling of Global's shares."

## ARGUMENT

I.  **The Court Should Not Extend *Diamond v. Oreamuno* To Recognize A Cause Of Action By The Corporation For "Tippee" Liability.**

In the *Winnick* action, the Estate Representative relied on *Diamond v. Oreamuno*, 24 N.Y.2d 494, 496-97 (N.Y. 1969), for the proposition that a corporation is entitled to seek disgorgement of profits realized by a fiduciary who sold stock based on material undisclosed information even though the company admittedly was not injured by the trading activity. In this case, the Estate Representative seeks to take *Diamond* one step further to hold shareholders who admittedly owed no fiduciary duty to the Company liable for insider trading under a "tippee" theory. The New York Court of Appeals has never extended *Diamond* in this fashion. Nor is there any reason to believe that it would do so today.

In the early 1970s, the Second Circuit dealt with the question of whether the Florida Supreme Court would adopt the rationale in *Diamond* and would extend it to tippees. In *Gildenhorn v. Lum's Inc.*, 335 F.Supp. 329 (S.D.N.Y. 1971), the district court had dismissed a derivative suit brought on behalf of Lum's against alleged tippees who had sold Lum's stock based on material inside information they had obtained from the company's president concerning a projected earnings decline. The district court concluded that Florida would look to New York

9

law on this issue and that the New York Court of Appeals would not have extended *Diamond* to create a corporate cause of action for disgorgement against tippees.   In support of that conclusion, the district court noted that the stated purpose of allowing a derivative action to be brought against corporate fiduciaries who had engaged in insider trading was to allow individual shareholders to act as "'private Attorney General[s] to . . . enforce proper behavior on the part of corporate officials.'"   335 F.Supp. at 334 (quoting *Diamond*, 24 N.Y.2d  at 503).   The court observed that "[I]t is implicit that the jurisdiction of these 'private attorney generals' would be limited to the corporation in which they are shareholders.   It could not, with any logic, be extended in a derivative action to cover outside individuals, corporations, or institutions who are subject to other private and governmental restraints on their behavior." *Id.*  In addition, the court noted that the *Diamond* court had affirmed the dismissal of other board members who were alleged to have helped the directors who had engaged in insider selling to conceal their activities. That affirmance "made it quite clear that *Diamond* extends only to corporate fiduciaries who actually profit by inside information and does not cover aiders and abettors and/or conspirators." *Id.*  The court concluded its analysis by stating that "[i]n view of the fact that the New York Court of Appeals could not bring itself to find liability for inter-corporate conspirators, I fail to perceive how this court could extend *Diamond* to cover extra-corporate conspirators and tippees." *Id.*

On appeal, the Second Circuit reversed, in a 2 to 1 decision. *Schein v. Chasen*, 478 F.2d 817 (2d Cir. 1973).   The majority concluded that the corporation could seek disgorgement from tippees who were involved in a "common enterprise" with the directors "to misuse confidential information for their own enrichment."   478 F.2d at 822.   In support of that conclusion, the majority cited case law holding that a person who "knowingly participates in or joins in an

enterprise whereby a violation of fiduciary obligation is effected is liable jointly and severally with the recreant fiduciary." *Id.* (internal quotations omitted). Judge Kaufman vigorously dissented. He began by observing that the *Diamond* court's decision to recognize a corporate cause of action for disgorgement, despite the fact that the corporation had not been injured by the defendants' trading activity, was "grounded solely in [the defendants] having breached a fiduciary duty owed by them to MAI as corporate officials." *Id.* at 826. To Judge Kaufman, this fact was dispositive of plaintiffs' claim for disgorgement against non-fiduciary tippees: "Liability in *Diamond* was predicated entirely on such a relationship, and in its absence, the *Diamond* rationale for liability ceases to exist." *Id.* at 827. Judge Kaufman also roundly criticized the majority for deciding a novel question of Florida law based on the assumption that Florida would adopt a New York decision and "would give an unprecedented expansive reading to that case":

> Despite the manner in which the majority opinion convolutes the law and the facts in this case, a view that a tippee is cloaked with state law fiduciary obligations to the corporation whose shares he trades is an unknown and untenable legal concept. Neither *Diamond* — itself a significant alteration of the common law principles applicable to an officer's or director's trading in his corporation's shares — nor the law of agency support such a holding. Nothing in the majority opinion tells us why or on what grounds a New York court would hold a tippee trader liable to the corporation for his profits under common law fiduciary principles, and the court exceeds its authority by substituting its own view of what state law ought to be, for what the state law actually is.

*Id.* at 828 (footnote omitted). Judge Kaufman ended his opinion by suggesting that the court should have certified the question of whether Florida would recognize a cause of action for disgorgement of a tippee's profits to the Florida Supreme Court. *Id.*

The defendants sought certiorari in the Supreme Court, which vacated the decision in *Schein* so the question could be certified to the Florida Supreme Court. *Lehman Bros. v. Schein*, 416 U.S. 386, 391-92 (1974). The Florida Supreme Court agreed with Judge Kaufman's

rationale and the district court's opinion and thus the dismissal of the tippee claim was eventually affirmed on appeal. *Schein v. Chasen*, 519 F.3d 453 (2d Cir. 1975).

Because it was vacated, the majority opinion in the 1973 *Schein* decision has no precedential value in deciding whether today the New York Court of Appeals would recognize a corporate cause of action for disgorgement against a non-fiduciary tippee. *See Assoc. for Retarded Citizens of Connecticut, Inc. v. Thorne*, 30 F.3d 367, 372 (2d Cir. 1994). However, the district court's original decision dismissing the complaint and Judge Kaufman's dissent provide a powerful explanation as to why such a cause of action would be inconsistent with the New York Court of Appeals' logic in creating a cause of action for disgorgement against fiduciaries who engage in insider trading in *Diamond*. Thirty years later, an expansion of *Diamond* to include non-fiduciary tippee liability makes even less sense. Indeed, as the CIBC defendants argued in *Winnick*, there is no longer any rationale for recognizing a *Diamond* cause of action.

At the time *Diamond* was decided, there was no "really effective remedy" under federal law for insider trading. 24 N.Y.2d at 503. "In view of the practical difficulties inherent in an action under the Federal law," the court believed that "the desirability of creating an effective common-law remedy [wa]s manifest." *Id.* In order to fill the gap it perceived in federal law, the *Diamond* court crafted a common law remedy on the model of Section 16(b) of the 1934 Act, which allows the company to sue directors to recover profits from impermissible "short swing" trading. *Id.* at 502-03. Today, however, insider trading provides a basis for a damages claim under Section 10(b). *In re Global Crossing, Ltd. Sec. Litig.*, 2005 U.S. Dist. LEXIS 26492 at *32-34 (S.D.N.Y. Nov. 7, 2005). In addition, Section 20A of the 1934 Act now creates an express cause of action for disgorgement of insider trading profits in favor of "contemporaneous" purchasers or sellers. *See* 15 U.S.C. § 78t-1(a)-(b). In light of these

developments, recent Delaware decisions have questioned the continuing viability of a common law breach of fiduciary duty claim for insider trading.  *See Goldman v. Isaacs*, 2001 WL 1671439 at *1 (Del. Ch. Dec. 17, 2001); *In re Oracle Corp. Derivative Litig.*, 808 A.2d 1206, 1214 (Del. Ch. 2002).  As these decisions explain, any need to fill a gap in federal law has been remedied.

Thus, at this point, there is plainly no need to extend *Diamond* even further to include disgorgement actions against non-fiduciary tippees. Recognizing such a claim would provide no benefit at all and would subject defendants to a real risk of double damages.  Under an extended *Diamond* theory, a tippee who profited from insider trading would be forced to disgorge any profits he realized to the corporation, even though the corporation suffered no injury from the trading activity. Section 20A, however, requires the same profits to be paid over to contemporaneous purchasers. Because it is impossible to disgorge the same profits to two different recipients, allocating any part of the disgorgement to the company would conflict with federal policy.  Whether or not such a claim would be preempted,[8] the possibility of such a conflict is yet another factor militating against any extension of *Diamond*.

In *Winnick*, this Court concluded that it was constrained to apply *Diamond* unless and until it was overturned by the New York Court of Appeals. 2006 U.S. Dist. LEXIS 53785 at *50. As Judge Kaufman explained in his dissent in *Schein*, the very same *Erie* principles preclude this Court from adopting the expansion of *Diamond* that the Estate Representative seeks in the absence of a decision by the New York Court of Appeals recognizing such an expansion.

---

[8]     The CIBC Defendants argued in *Winnick* that a *Diamond* claim would be preempted by federal law.  The Court declined to address that argument on the motion to dismiss, but noted that it could be raised later on summary judgment. 2006 U.S. Dist. LEXIS 53785 at *51. Defendants in this action also reserve the right to argue preemption in the event that the Court extends *Diamond* to include claims against alleged tippees.

The Estate Representative does not allege that any of the defendant corporations in this action owed fiduciary obligations to Global Crossing. Moreover, there is no claim that the individuals who owned and controlled the Non-Director Corporations ever stood in a fiduciary relationship to Global Crossing.[9]   Because the New York Court of Appeals has never recognized a corporate cause of action for disgorgement of insider trading profits against a non-fiduciary tippee, the Estate Representative's complaint should be dismissed with prejudice.

## II.   The Estate Representative Has Failed To Properly Plead A Claim For Tippee Liability.

In any event, even if the Estate Representative could bring a claim for disgorgement of insider profits, it has not properly pleaded such a claim. At the threshold there is a question as to what pleading standard applies. As the Estate Representative apparently recognizes, in order to state a claim under an extension of *Diamond*, plaintiffs would have to plead and ultimately prove that all of the defendants participated in a "common enterprise" to pass information about Global Crossing's "true" financial condition from corporate fiduciaries (presumably the CIBC-Related Directors) along to the defendants, to enable the defendants to profit from insider selling.[10]   As pleaded in the Estate Representative's complaint, defrauding the market was an integral part of the alleged "multiyear [insider trading] scheme." Because these allegations "sound in fraud," the heightened pleading requirements of Rule 9(b) apply. *See Rombach v. Chang*, 355 F.3d 164, 171

---

[9]   The Director Corporations were, of course, controlled by individuals who had been fiduciaries of Global Crossing before the sales were made. However, as demonstrated in the motion for summary judgment submitted along with this motion, REDACTED

[10]   This is the standard suggested by the majority in the 1973 *Schein* decision, when it attempted to provide a rationale for subjecting non-fiduciary tippees to liability to the corporation, despite the fact that they had never inflicted any harm on the corporation. 478 F.2d at 822.

(2d Cir. 2004) (applying Rule 9(b) to 1933 Act claims, even though those claims do not require proof of fraud, "insofar as those claims are premised on allegations of fraud").

As the Court explained in *Rombach*, fraud allegations "may damage a defendant's reputation regardless of the cause of action in which they appear, and they are properly subject to Rule 9(b) in every case." *Id.* (internal quotations omitted). That observation is certainly true here. Accusations of manipulation of financial results and insider trading are likely to have a devastating effect on the reputations of the individuals who owned and controlled the investment vehicles the Estate Representative has sued — all of whom are employed in the securities industry.

In an attempt to meet its pleading burden, the Estate Representative alleges that the CIBC-Related Directors and unidentified "CIBC Entities" knew that Global Crossing was improperly accounting for the sale of IRUs and became aware, at least by the time the last CIBC-Related Directors resigned from the Global Crossing Board, that Global Crossing was insolvent. It also alleges that the defendants themselves knew that Global Crossing was already insolvent and that the CIBC-Related Directors resigned on June 20 so that all of the defendants could sell their stock before the truth came out. These allegations require the Estate Representative to show not only knowledge by the CIBC-Related Directors, but also communication of that knowledge to a group of approximately 25 fellow employees and participation by all of those employees in a pre-arranged scheme to engage in insider trading, in knowing violation of both the CIBC-Related Directors' fiduciary duties and federal insider trading laws.

Nowhere in the complaint are there any factual allegations to support the Estate Representative's conclusory allegations that an insider trading scheme existed — let alone the allegation that all of the defendants were knowing participants in that scheme. As the court

observed in *Endovasc Ltd., Inc. v. J. P. Turner & Co.*, 2004 WL 634171 at *6 (S.D.N.Y. Mar. 30, 2004), "[c]ourts are especially vigilant in applying Rule 9(b) where [as in this case] a complaint is made against multiple defendants. Each defendant is entitled to be apprised of the circumstances surrounding the fraudulent conduct with which it individually stands charged." Here, as to most of the Non-Director Corporations, the plaintiff has not even bothered to allege *when* the insider trading allegedly occurred, let alone offered any facts to support the allegation that the individuals who controlled those corporations were privy to inside information about Global Crossing.

The new complaint is filled with allegations that Global Crossing was materially inflating its financial results by misreporting IRU sales and swaps, that the Company was experiencing a variety of difficulties that were not disclosed to the public, and that Jack Grubman of Citicorp was deliberately hyping the stock to keep the price inflated. But what is missing is any factual allegation to support the conclusory assertion that the CIBC-Related Directors and "CIBC Entities" were either aware of or participated in Global Crossing's alleged scheme to create a "hugely distorted picture of Global's financial condition." Complt. ¶ 100. For example, the complaint goes on for pages and pages (at ¶¶ 101-136) about Global Crossing's alleged manipulations of its financial statements. But there is no allegation that CIBC or any CIBC-Related Director had any involvement in the preparation of those financial statements or even served on Global Crossing's Audit Committee. Instead, all the Estate Representative can muster is the vague assertion that "[t]hrough its representatives on the board of directors, CIBC encouraged and approved of the Company's use of 'Adjusted EBITDA' as its preferred method of reporting earnings beginning with its reports of results for the year 1999." Complt. ¶ 135. Even assuming that that statement is entirely true, it does not advance the Estate Representative's

cause because it fails to tie CIBC or the CIBC-Related Directors — let alone any of the other defendants — to any knowledge of any misstatements in Global Crossing's financial statements.

The same is true of the other scattered allegations in the complaint about the alleged knowledge of insiders about Global Crossing's problems. The Estate Representative cites the now infamous Hindery memo, dated June 5, 2000, which warns that "the stock market can be fooled, but not forever, and it is fundamentally insightful and always unforgiving of being misled." But it alleges that this "confidential memorandum" was sent only to "Winnick and other officers of Global Crossing." Complt. ¶ 166. There is no allegation that any of the CIBC-Related Directors ever saw the memo. The same is true of emails cited in the complaint that supposedly show that Global Crossing was suffering from irreversible problems. Those emails are alleged to have been sent from one Global Crossing employee to another; there is no allegation that any of them were ever shown to any of the CIBC-Related Directors. See Complt. ¶¶ 229-30.

The complaint also contains a long section (at ¶¶ 223-241) about how Jack Grubman supposedly helped prop up the price of Global Crossing stock by issuing bullish research reports on the Company, both while the CIBC-Related Directors were on the Board and after they left. What is missing once again, however, is any allegation of a linkage between Grubman and CIBC or any of the CIBC-Related directors. Thus, the complaint provides no factual basis whatsoever for the conclusory assertion that CIBC and the CIBC-Related Directors knew that Global Crossing was doomed to fail — let alone any basis for concluding that such a message was communicated to the CIBC employees who owned the Non-Director Corporations.

As noted above, the complaint alleges that the CIBC-Related Directors left the Global Crossing Board in June 2000 so they and all of the defendants could sell their stock

anonymously, before the market discovered the truth about Global Crossing. This allegation might have had some traction if the Estate Representative had been able to point to a large number of sales by the defendants shortly after the resignations. But the complaint does not contain any such allegations. As noted above, only *one* individual (who was not a CIBC-Related Director) directed his corporation to sell Global Crossing stock in the summer of 2000. And even then, he chose to sell only a relatively small percentage of his corporation's holdings — even though the stock was trading at half the price it had enjoyed when the company had first received it in February 2000. That decision (and the similar decisions in September 2000 by Heyer to sell a relatively small portion of his corporation's holdings and by Levine to enter into a hedging arrangement) demonstrates that Wagner still believed that the stock had upside potential and wanted to be able to participate in that potential — a proposition utterly inconsistent with the claim that these defendants were selling because they knew Global Crossing was insolvent.

Subsequently, in the fall of 2000 and again in January 2001, four of the Director Corporations either sold or hedged their Global Crossing stock and two of the Non-Director Corporations sold stock. But by the summer of 2000, the Company had reported a net loss for the first quarter of 2000 of $262 million; by mid-August it had reported a net loss for the first six months of $668 million; and by November 14, 2000, it had reported a net loss of a whopping $1.2 billion for the first three quarters of the year. *See* Schmeltz Decl. Ex. 2. Predictably, the price of Global Crossing stock fell in response to these disclosures. Schmeltz Decl. Ex. 1. Under these circumstances, the sales that are actually alleged in the complaint are not suspicious in either timing or amount and therefore cannot support a claim of insider trading. *See In re Oxford Health Plans, Inc.,* 187 F.R.D. 133, 139 (S.D.N.Y.1999) ("Insider sales of stock may be

evidence of scienter [that is, trading on inside information] if the trades are unusual or suspicious in timing or amount").

The fact that the Estate Representative has not alleged when most of the defendants sold their Global Crossing stock also shows that it has no basis for its claim of a grand insider trading scheme. *See Rattner v. Bidzos*, 2003 WL 22284323 at *10 (Del. Ch. Oct. 7, 2003) (state law insider trading claim was inadequate where, among other things, the plaintiff failed to "pinpoint the timing of the challenged sales"). If the Estate Representative knows that those defendants sold their stock (rather than hanging on to the end), it ought to know *when* they sold. Under those circumstances, its failure to allege when those sales occur suggests that they all occurred at times and prices that would make any claim of insider trading ludicrous. The Monello allegations illustrate the point. How can the Estate Representative possibly claim, with a straight face, that Monello engaged in insider trading when it held over 2 million shares of Global Crossing stock almost to the bitter end, when the stock was selling for only $1.20 per share? It defies logic to claim that Monello — and anyone else who rode the stock down nearly to the bottom — was part of an insider trading conspiracy. Because the Estate Representative's own allegations negate any possible claim of insider trading by Monello, all claims against the M. Monello Corporation should be dismissed.

The alternative explanation for the Estate Representative's failure to pinpoint when more than two dozen of the defendants sold their Global Crossing stock is that the Estate Representative has no idea when or if they sold. If that is the case, then the complaint is nothing more than an unsupported fishing expedition against the companies named. At the very least, the claims asserted against those defendants should be dismissed.

That the Estate Representative cannot allege a pattern of trading by the entire group of defendants, however, leads to the conclusion that the entire complaint should be dismissed. Once again, the Estate Representative's allegation is that the defendants all knew that Global Crossing was insolvent and intended to sell off their stock before the market discovered the fraud. Under those circumstances, it would have been completely irrational for any of the defendants to hold onto their Global Crossing stock for any significant period of time. At that point, even the Estate Representative would apparently concede that they no longer had any pipeline to inside information. If Global Crossing was truly insolvent, there could be no assurance as to when the truth would come out. Thus, if defendants had really been involved in the insider trading scheme alleged in the complaint, all of them would have sold as soon as possible. That all of them hung onto the stock for many months and at least one (if not many) of them held on to the bitter end negates any possible inference of insider trading.

In short, the Estate Representative has no factual allegations to support the claim that CIBC and the CIBC-Related Directors knew that Global Crossing was insolvent, that they passed that information on to the defendants pursuant to a pre-arranged scheme, or that the defendants sold based on information that was not available to other investors. Indeed, even under notice pleading rules, the complaint's allegations concerning the defendants' possible sales of stock at times that might reflect the possibility of insider trading would be woefully inadequate to support the Estate Representative's insider trading claim. *See Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005) (even under Rule 8, a complaint must provide a "reasonably founded hope" that discovery will reveal relevant evidence in order to prevent the filing of "largely groundless claims[s] to simply take up the time of a number of other people, with the right to do so representing an *in terrorem* increment of the settlement value"); *In re Elevator Antitrust Litig.*,

2006 WL 1470994 at *8 (S.D.N.Y. May 30, 2006) ("something in the way of a factual predicate for alleging a price fixing conspiracy must be pleaded"; allegations that "there are various kinds of anticompetitive conduct which the four defendants might have committed against some unspecified purchasers, and that the defendants did all these various possible things by conspiring and agreeing to do so" are insufficient even under a notice pleading standard).

CONCLUSION

For the foregoing reasons, the claims against all of the defendants who have been served should be dismissed with prejudice.

Dated: New York, New York

November 2, 2006

Respectfully submitted,

MAYER, BROWN, ROWE & MAW LLP

*Robert J. Ward*

Robert J. Ward (RW 0149)
1675 Broadway
New York, New York 10019
(212) 506-2500

OF COUNSEL:
Alan N. Salpeter
Michele Odorizzi
T. Mark McLaughlin
Daniel L. Ring
Vincent P. Schmeltz III
MAYER, BROWN, ROWE & MAW LLP
71 South Wacker Drive
Chicago, Illinois 60606
(312) 782-0600

21